

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00352-CV

_____

IN THE INTEREST OF Z.G., A CHILD

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-536127-13

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

### I. Introduction

In its judgment in this modification suit affecting the parent-child relationship (SAPCR), the trial court appointed Appellee J.K., Zachary's[1] maternal grandmother (Grandma), as his sole managing conservator and set out the terms of supervised visitation with Appellant Father and Appellee Mother[2] as Zachary's possessory conservators.

In four issues, Father appeals, complaining that the trial court abused its discretion (1) by ordering supervised possession instead of a less-restrictive means of protecting Zachary's best interest; (2) by failing to order a possession plan through which Father could eventually have unsupervised possession; (3) by granting overlapping rights of possession to Mother and Father on Zachary's birthday; and (4) by including fact findings in the final order that could expose Father to embarrassment. We delete the findings from the trial court's judgment and affirm the judgment as modified.

### II. Background

Sometime in the autumn of 2010, Father and Mother engaged in sexual intercourse, resulting in her pregnancy with Zachary.

---

[1]We use pseudonyms for the child's name and for his family's names to preserve his privacy. *See* Tex. Fam. Code Ann. § 109.002(d).

[2]Mother has adopted Grandma's appellate brief.

2

Some months later, in February 2011, Father met his future wife, Renee. In June 2011, Zachary was born early and spent a month in a neonatal intensive care unit. Because he had tested positive for methamphetamine at birth, when Zachary was released from the NICU, Child Protective Services (CPS) placed him with Grandma.[3] When Mother completed her child safety plan, she moved back in with Grandma and Zachary.[4]

According to Grandma, after Zachary's birth, Mother sent photos of and messages about Zachary to Father, who ignored them. Mother said that CPS had also contacted Father when Zachary was born. However, Father said he learned that Zachary was his son only two months before he married Renee in June 2012 and that Zachary was one-and-a-half years old before the State "had [him] do a DNA test." Once the DNA test confirmed that Zachary was his son, Father initially asked for his parental rights to be terminated but then changed his mind. Renee described Father's thought of terminating his parental rights to Zachary as "very short lived."[5]

---

[3]At the time of trial, Grandma had been a flight attendant for 22 years and had taken care of Zachary before Mother completed her child safety plan in 2012. Through the time of trial Grandma's son Martin, Mother's brother, lived with Grandma and helped her with Zachary when she travelled for work. Martin had voluntarily relinquished his parental rights to his daughter, who lived in Oklahoma.

[4]Mother lived with Grandma's friend Eleanor until she completed her child safety plan. Eleanor also helped Grandma with childcare.

[5]Father has a daughter with his ex-wife, to whom he pays child support. Renee has two older children. In August 2013, Renee and Father bought a four-bedroom, three-bathroom house. Renee's son moved out of the house after he graduated from

## A. Procedural History

Mother and Zachary lived with Grandma through 2013, when the Office of the Attorney General sought to locate Father for child support. The OAG sued Father, and the litigation continued in 2013 and 2014. During that time both Mother and Father vied for sole managing conservatorship of Zachary.[6]

After Mother suffered a drug relapse in March 2014, Grandma took custody of Zachary. In mid-April 2014, Grandma and Father became Zachary's temporary managing conservators, and during that time, Zachary lived with Father four days a week and with Grandma three days a week while Grandma supervised Mother's possession. They eventually went to a one-week-on/one-week-off possession schedule. In April 2016, Father started his own business, an air-conditioning company, of which he was the sole employee.

The parties mediated a settlement agreement, and in December 2017, the trial court entered an agreed final order incorporating the MSA, which gave Father possession of Zachary on the first, third, fourth, and fifth weekends of each month; required Mother to submit to random drug tests at Father's request through June 24,

---

high school in 2015 or 2016 and was living with his paternal grandparents at the time of the trial. Father said that Renee's son had developed a drug problem after high school but denied that they had evicted him because of it.

[6]The OAG nonsuited in June 2015.

2020; and provided that if Mother tested positive, she would have no possession of Zachary until further court order.

In February 2018, after Renee told him that Mother was behaving erratically when they exchanged Zachary, Father asked Mother to take a drug test. When Mother tested positive for methamphetamine, Father filed a petition to modify, asking the court to appoint him as Zachary's sole managing conservator, to make him the person with the exclusive right to designate Zachary's primary residence, and to order Mother to pay child support. *See* Tex. Fam. Code Ann. § 156.102(a), (b)(1). Father took possession of Zachary, removed him from his Northwest ISD kindergarten, and enrolled him in McKinney ISD.

At the end of May 2018, Mother asked the trial court to order Father to take a drug test. On June 19, 2018, the trial court ordered Father to do so by June 22. After Father's June 22 five-panel hair test was positive for cocaine, Grandma filed a petition in intervention, seeking to be appointed as Zachary's sole managing conservator or to be named his joint managing conservator with Mother and asking for both parents to be ordered to pay child support to her. In the affidavit sponsoring her petition, Grandma alleged that between May 22, when Mother had moved the court to order Father to take a drug test, and June 26, Father had "drastically changed his appearance in that he shaved all hair from his head, his beard, his arms, and his chest[,] complaining of eczema, which clearly raise[d] a red flag for drug use given his recent positive hair drug screen for cocaine."

5

The trial court granted Grandma temporary sole managing conservatorship in August 2018 but reserved the issue of child support until trial.

## B. Evidence at Trial

The evidence at trial addressed Zachary's medical and educational situation, as well as how Father disciplined him, both parents' drug use, the possibility of parental alienation, and how the parties communicated and participated in Zachary's life.

### 1. Zachary's Medical Condition

When he was about three years old, Zachary was diagnosed with encopresis,[7] or fecal incontinence (leaking stool), which had troubled him since his birth. Zachary's fecal incontinence caused him to develop granuloma gluteale infantum, a rare form of

---

[7]Encopresis, another name for fecal incontinence,

is the repeated passing of stool (usually involuntarily) into clothing. Typically it happens when impacted stool collects in the colon and rectum: the colon becomes too full and liquid stool leaks around the retained stool, staining the underwear. . . .

Encopresis usually occurs after age 4, when a child has already learned to use a toilet. In most cases, soiling is a symptom of chronic constipation. Far less frequently it occurs without constipation and may be the result of emotional issues.

Encopresis may be frustrating for parents—and embarrassing for the child. However, with patience and positive reinforcement, treatment for encopresis is usually successful.

Mayo Foundation for Medical Education & Research, *Encopresis*, https://www.mayoclinic.org/diseases-conditions/encopresis/symptoms-causes/syc-20354494 (last visited March 29, 2021).

contact dermatitis[8] caused by incontinence of liquid stool.[9]   When Zachary leaked stool, the skin around the leak became painful and, according to Mother, "burned and red and swollen."

Zachary endured daily accidents in his underwear until he started seeing Dr. Bankole Osuntokun, a pediatric gastroenterologist at Cook Children's Medical Center, who prescribed a daily regimen of MiraLAX,[10] in addition to his regular pediatrician, Dr. Stephen Weis.[11]

According to Grandma, Father was told about Zachary's bowel problems when he first met the child, but Father had been dismissive, had blamed Zachary's diet, and

---

[8]Contact dermatitis "is a red, itchy rash caused by direct contact with a substance or an allergic reaction to it.  The rash isn't contagious or life-threatening, but it can be very uncomfortable."  Mayo Foundation for Medical Education & Research, *Contact Dermatitis*, https://www.mayoclinic.org/diseases-conditions/contact-dermatitis/symptoms-causes/syc-20352742 (last visited March 29, 2021).

[9]*See* Nadya A. Al-Faraidy & Sahar H. Al-Natour, *A Forgotten Complication of Diaper Dermatitis: Granuloma Gluteale Infantum*, 17 J. Fam. & Cmty. Med. 107, 107–09 (2010) (defining granuloma gluteale infantum as "a rare condition . . . presenting as asymptomatic cherry red nodules in the diaper area appearing in the setting of primary irritant contact dermatitis"), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3045094/ (last visited March 29, 2021).

[10]MiraLAX is an osmotic laxative used to soften and ease stool through the colon.  MiraLAX, "MiraLAX is Different," https://www.miralax.com/miralax-is-different (last visited March 29, 2021).

[11]Some of Zachary's medical records with Dr. Weis were admitted into evidence "for the purpose of showing the pattern" of Zachary's past and continuing gastric issues.

had proposed a number of alternative diagnoses, such as food allergies. During the trial, Father confirmed his belief that Zachary's diet was the cause of his fecal incontinence and claimed that a doctor had suggested a dietary change.[12]

Dr. Weis noted during Zachary's March 25, 2014 appointment that the child had "approximately 30 bright red painful papules on a erythematous scaly base that extend[ed] 15 cm around the perianus circumferentially[, and which were] exquisitely painful" when touched. He also noted during that appointment that it would be difficult to make progress treating Zachary's medical conditions without consistency in treatment. Grandma told Dr. Weis that Dr. Osuntokun had said that Zachary was avoiding defecation because of pain, and an X-ray of Zachary's abdomen that was taken at Cook Children's Medical Center confirmed a large amount of fecal material present throughout his colon.

Although Zachary's condition had improved by October 2014, in December 2014, Mother told Dr. Weis that each time she picked him up from Father's custody, Zachary would seep stool and that Father had threatened to report her to CPS based on an opinion he had received from Dr. Louis Coates, a pediatrician that Father had consulted.[13] Dr. Weis conversed with Dr. Coates and explained to him that as a result

---

[12]Renee testified that she did not know all of the details about Zachary's medical issues but said that diet seemed to help.

[13]Dr. Coates testified that he had received documentation from Dr. Weis in December 2014. He did not recall talking about it with Father. Father had not informed him that Zachary had been seeing a specialist in Fort Worth.

8

of the X-rays at Cook Children's Medical Center and a biopsy to rule out other causes of dermatitis, Zachary had been diagnosed with granuloma gluteale infantum in conjunction with his fecal incontinence. The two doctors discussed the fact that "the parents do not trust each other and as a result [Zachary's] regime is different with each parent. Each parent apparently believes that what the other parent is doing is causing the problem." Once Dr. Weis explained the entire situation to Dr. Coates, Dr. Coates told Dr. Weis that he would encourage Father to give Zachary his daily 17-gram dose of MiraLAX and to cooperate with the bowel training.

But at Zachary's follow-up appointment with Dr. Weis, Zachary was once more "covered with stool" and the medical staff "could not visualize the anal verge or perianus" until they cleaned him in the sink with warm water, revealing that he had "bright red erythematous papules that [were] exquisitely sensitive to touch extending 4–5 cm around his anal verge." Dr. Weis noted that this was still an improvement from when he had initially seen Zachary in March 2014, when Zachary had around 30 papules, because that amount had been reduced to "approximately 15–20."

Father testified that Zachary had seen Dr. Osuntokun three or four times but that Father had not been present at any of those visits because he was either working or had "something going on with [his] business." He nonetheless insisted that nothing was more important than Zachary and agreed that he probably should have attended those appointments. He said that it had not occurred to him to ask Grandma to reschedule the appointments so that he could attend.

Grandma testified that when Father took custody of Zachary in February 2018, she had asked him to please "take care of [Zachary's] bottom" but that he told her, "I don't deal with that anymore. I just send him to his room." Grandma said that when Father had Zachary from February to July 2018, "every Saturday morning, we'd pick him up at 10:00 o'clock, and we would have to take him home, wash his clothes, give him a bath, and put medicine on him" because Father had not been giving Zachary his MiraLAX or keeping him clean.

Father said that CPS had contacted him in May 2018 based on allegations of neglect relating to Zachary's fecal incontinence and that Zachary had come to him from Mother or Grandma with soiled pants.[14] At CPS's request, Father took Zachary to see Dr. Coates shortly thereafter, but he did not tell Mother or Grandma that CPS had contacted him or that he had taken Zachary to see Dr. Coates. CPS closed the case after investigating, but Father did not know what CPS's disposition had been.[15]

Father testified that Zachary's fecal incontinence had improved while in his care from February to July 2018:

---

[14]Father took a photo of Zachary's feces-soaked shorts, and the photo was admitted into evidence.

[15]After investigating a child abuse or neglect allegation, CPS will assign one of five possible dispositions: (1) reason to believe (based on a preponderance of the evidence); (2) ruled out; (3) unable to complete; (4) unable to determine; or (5) administrative closure. *In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *2 n.5 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (referencing 40 Tex. Admin. Code § 700.511(b) (Tex. Dep't of Family & Protective Servs., Disposition of the Allegations of Abuse or Neglect)).

10

Q. When you had [Zachary] in your primary care from February until July, did he experience any problems pooping in his pants?

A. He did at the beginning.

Q. And then what happened?

A. Towards the middle to end of May, end of June, we weren't having any issues at that time.

But Grandma offered into evidence three photos of Zachary's naked bottom that she had taken on April 28, 2018; May 1, 2018; and July 20, 2018 that indicated otherwise.[16] The trial court admitted these photos into evidence as Exhibits I-16, I-17, and I-18.

Though Exhibit I-16, the April 28, 2018 photo, has poor resolution, it is unarguably clear that the child's skin, in the area from his anus to around 2 inches from the anus, is extremely red and swollen, with what appear to be raised, deep red lesions on both sides of the anus. The remains of loose fecal matter can be seen around the entire area.

Exhibit I-17, the May 1, 2018 photo, also has poor resolution but shows that the child's skin in the area from his anus to an inch to two inches of skin around the anus is red and swollen, with the same raised lesions in the April 28, 2018 photograph, along with the remains of loose fecal matter around the entire area.

The July 20, 2018 photo, Exhibit I-18, has substantially better resolution than the first two photographs and shows significantly less swelling and redness and only

---

[16]Grandma said that the photos showed how Zachary's bottom usually looked when he returned to her after a stay with Father.

one mild lesion, but it still depicts red and pink areas of swelling that expand from the child's anus to at least an inch from the anus. Grandma said that she took this photo after the trial court allowed her to take Zachary from Father's primary custody.

During cross-examination by Grandma's counsel, Father claimed that he could not remember many details concerning his son's medical situation:

Q. Were you not advised that this child in 2014 was seeing a specialist for fecal incontinence and encopresis?

A. They had gone to see a doctor is all I knew. Nothing was ever given to me in documentation.

Q. Did you ever inquire as to why are you taking my son to a doctor?

A. Yes.

Q. What were you told?

A. That was four years ago, and I can't tell you.

Q. You have no idea?

A. It has been four years ago. I can't remember.

Q. Are you aware that your son suffers from a rare skin disease?

A. What is that?

Q. Well, haven't you seen the poop in his pants?

A. Yes, ma'am.

Q. Haven't you seen the fact that this child, when he poops in his pants, his bottom becomes inflamed and red with giant lesions that are bloody?

12

A. Yes, ma'am.

Q. Haven't you seen that?

A. I have seen it when he hasn't been taken care of, yes.[17]

. . . .

Q. Do you understand that your son is seeing Dr. Osuntokun and he has prescribed that your son takes Mira[LAX]; is that correct?

A. Yes, ma'am.

Q. And the Mira[LAX] empties out his little intestines, so he will not have the diarrhea or the leakage, which causes the lesions, is that correct, or do you even know?

A. Ma'am, I'm not a doctor. I know what a laxative is, yes.

Q. But you know he is supposed to be taking Mira[LAX]; is that correct?

A. It comes with us every time we pick him up.[18]

Q. Have you, at any point since this child has been seeing this specialist at Cook's per Judge Riek's orders, have you failed to give him the Mira[LAX]?

A. I have not failed to give it to him.[19]

Q. Have you told this child that his doctors are stupid and he doesn't need the Mira[LAX]?

---

[17]During the first day of trial, Father admitted that with regard to Zachary's fecal-incontinence symptoms, "He has had some dirty drawers."

[18]Grandma testified that every time she took Zachary to the exchange, she gave Renee two packets of MiraLAX for Zachary to take on Saturday and Sunday.

[19]According to licensed professional counselor Dr. Gina Galloway, one month before trial Zachary told her that Father did not regularly give him his MiraLAX.

A. No, ma'am.

Q. Have you told this child that [Grandma] and [Mother] don't know how to take care of him and that all he needs are fruits and vegetables and a different diet?

A. No, ma'am.

Q. Do you recall telling Dr. Coates on 5/15/18 that he had a rash on his bottom and this is when you had custody of him . . . because of [bowel-movement] accidents?

A. We had to, yes.

Q. Do you not remember and did he have those lesions at that time on his bottom?

A. He did not have lesions at that time.

Q. But he had a bad rash, correct?

A. No, ma'am.

. . . .

Q. . . . Do you recall telling the child that all doctors are quacks?

A. No, ma'am.

Q. When [Grandma] and/or [Mother] in the past have given you drugs, prescription drugs for the child, have you followed those instructions?

A. Yes, ma'am.

Q. If you were aware in 2014 that this child was seeing a specialist, did you tell Dr. Coates that the child was seeing a specialist, so there wouldn't be some t[y]pe of conflict with regard to the child's medicine?

A. Ma'am, I don't know that.

14

Q. You don't know?

A. No.

Q. Would you have reported, when you took your son in -- normally, they ask if the child is on any medications. Do you recall that?

A. Ma'am, that is five years ago. I do not know.

## 2. Discipline

Zachary began seeing Dr. Galloway in May 2016, when he was almost five years old. Dr. Galloway said that Mother had brought Zachary to her because Zachary had been resistant to going to Father's house. Zachary's counseling notes with Dr. Galloway from June 9, 2016, to March 20, 2019, were admitted into evidence without objection.[20]

Zachary's counseling notes reflect that Zachary told Dr. Galloway that Father called him names but that Renee told Father to stop when he called Zachary cuss words. Dr. Galloway noted, "Dad called him a 'bull shit.'" Renee testified that the only time she had ever heard Father call Zachary something inappropriate was the time he called him "Poopy Pants." Father acknowledged that he had called Zachary "Poopy Pants," but he said that he did not regularly call Zachary that. Father said that

---

[20]In his reply brief, Father complains that Zachary's statements to Dr. Galloway are hearsay. However "[i]nadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay." Tex. R. Evid. 802; *see In re I.C.*, No. 02-15-00300-CV, 2016 WL 1394539, at *11 (Tex. App.—Fort Worth Apr. 7, 2016, no pet.) (per curiam) (mem. op.) ("[U]nobjected-to hearsay is, as a matter of law, probative evidence.").

15

he had only called Zachary by that name once "and had a conversation afterwards about it." As he explained, because "kids are extremely mean to each other when they get a hint of something they can pick on a child for," through this conversation, he demonstrated to his son how he expected his son would be bullied because of his fecal incontinence. Although Father admitted that he was unaware whether Zachary had been made fun of at school because of the problem, he wanted his son "to realize that is what kids were going to start calling him."

Zachary told Dr. Galloway that Father was "mean" and that he spanked him "all the time," particularly when he leaked stool into his clothing,[21] which Zachary told her he could not control, stating, "[I]t just comes out." At one point in September 2016, Zachary asked Dr. Galloway, "Can you tell the judge that my dad spanks me when I poop in my pants?"[22] Zachary also told Dr. Galloway that he hated Father for spanking him, particularly when he spanked him with a belt, and for not letting him watch television.

---

[21]At his October 11, 2016 appointment, Zachary told Dr. Galloway that Father had spanked him when he had pooped in his pants at school. In June 2017, Zachary told Dr. Galloway that Father spanked him with a belt when he pooped his pants, and Mother showed Dr. Galloway photos of Zachary's bruises from the spankings. In July 2017, Zachary told Dr. Galloway that Father was still spanking him with a belt for pooping in his pants.

[22]Dr. Galloway said that what Zachary had asked her "sounds like these parents have very much involved this child in the litigation process, and that's . . . just not appropriate for children to be involved in." In November 2018, Zachary reported to Dr. Galloway that Father smoked in front of him "a lot" and had "lied to the judge" by saying that he did not smoke in front of Zachary.

16

Dr. Galloway made two CPS referrals[23] about Zachary. The first was in December 2016, relating to possibly excessively harsh discipline by Father, for spanking with a belt and leaving marks.[24] The second was after an April 2018 session during which Zachary told Dr. Galloway that Father would not clean his bottom and made him do it himself. Dr. Galloway reported Father to CPS for "neglect due to [Zachary's] hygiene issues in his genital area."[25]

Dr. Galloway said that Zachary regularly reported what sounded like excessive or harsh discipline for things that were outside of his control[26] and that they regularly discussed Zachary's feeling intimidated by Father. Dr. Galloway said that with regard to Zachary's reporting about why he was being punished, he had told her that sometimes he was punished for having a bowel movement in his pants, "even though

---

[23]As a licensed professional, Dr. Galloway was required to make a report to CPS if she believed that Zachary had been harmed or was being abused. *See* Tex. Fam. Code Ann. § 261.101(b).

[24]In 2017, Mother told Dr. Galloway that Zachary's school had reported Father to CPS because he had marks where Father had spanked him with a belt for pooping his pants.

[25]Dr. Galloway assumed that her CPS reports had been either ruled out or found undetermined because CPS had not taken any action.

[26]Zachary's first-grade teacher testified that Zachary had a good sense of humor and was a very conscientious student. She said that she had no concerns about any disciplinary problems with him. Zachary's kindergarten teacher had noted on May 17, 2018, that Zachary was strong in math and science, was "a very happy child who is attentive and wants to do his best," and was successful in his "social/emotional/behavioral skills."

17

that was outside of his control," and sometimes he was punished "for not telling [Father] that he had had a bowel movement in his pants, and so [Father] would say he had lied to him."[27]

In April 2018, Zachary reported to Dr. Galloway that he had been grounded when he lied to Father about pooping his pants but told her that he lies because he is scared of how Father will respond. He also told her that Father would not let him take extra clothes to school for when he pooped his pants because Father did not think that he needed them.[28] By August 2018, Zachary reported to Dr. Galloway that Father was no longer spanking him.

During the 2019 trial, Father said that he had "probably swatted [Zachary] on the butt once or twice" but that he had "[a]bsolutely" never used a belt when disciplining him. When the trial judge asked Father if he had ever spanked Zachary for pooping in his pants, Father replied, "No, ma'am." On cross-examination, when asked whether it would surprise him to know that Zachary had told Dr. Galloway that

---

[27]At the December 21, 2016 session, Zachary told Dr. Galloway that Father had spanked him with a belt after Renee "tattled" on him and that he had gotten in trouble with Father for pooping his pants.

[28]Zachary's first-grade teacher was aware of Zachary's medical problem but said it had not been an issue in her classroom. She said, "I think one time maybe [Grandma] had said that he had an accident coming home from school, but I don't think it's really been – to my knowledge, he hasn't had but maybe one or two this year, I think, maybe."

he had spanked him a number of times with a belt, Father said that it would. Renee said that she had never seen Father spank Zachary, with or without a belt.

### 3. Dyslexia

Zachary's kindergarten teacher noted in Zachary's school records that Father had told her that he was dyslexic and that there was a family history of dyslexia. Zachary was tested for dyslexia by McKinney ISD in May 2018, but Father did not tell Grandma or Mother about the school meeting addressing it because "[i]t was a last minute deal before they were closing school" for the summer, "[b]ecause we were going through the Court case," and because he "probably forgot to call [Mother] and tell her." But Zachary's school records reflect that the meeting was held on June 4, 2018, and that Father had received notice of the meeting on May 23, 2018. McKinney ISD diagnosed Zachary as having dyslexia. Grandma testified that she had not known about Zachary's dyslexia diagnosis until Father testified about it at an August 2018 hearing.

Other than when he had strep throat, Zachary's school attendance had been good,[29] and he had won the Grit Award during the fall term, an "award for a child that shows perseverance in something they maybe have struggled [with] in the past."[30]

---

[29]Grandma testified that Zachary had received 3 perfect attendance awards.

[30]Zachary struggled with reading because of his dyslexia, and Father said that he and Renee had worked with Zachary on his reading.

19

### 4. Drug Use

Mother, who was 41 years old at the time of the trial, had been a drug addict for 12 years, and she tested positive for drugs at least twice during the litigation. Mother said that she had lived on and off with Grandma for her whole life but that she had never used drugs in Grandma's house.

Father said that he had used cocaine 20 years ago but not since then, notwithstanding the results from his June 22, 2018 hair-strand test, which was positive for cocaine and benzoylecgonine, a byproduct of cocaine decomposition. He attributed his positive hair-strand drug test to his having been exposed to cocaine when working on customers' air-conditioning units because he "[c]rawl[ed] through families' attics to get to their AC units," where he changed air filters, cleaned the units, and performed preventive maintenance. Father's July 25, 2018 toenail test was negative for any drugs.

Mother's expert toxicologist, Dr. Gary Wimbish, reviewed Father's drug tests and said that based on the quantity reflected in the lab report,[31] he did not think Father could have tested positive for cocaine and benzolecgonine from merely passive or incidental exposure.

---

[31]Father's June 22, 2018 drug-test results showed that benzolecgonine was detected at 270 pg/mg (picograms per milligram) and that cocaine was detected at 1,134 pg/mg. Norcocaine and cocaethylene were not detected.

20

In response to questions by the trial judge, Dr. Wimbish testified that Father's explanation was improbable and unrealistic:

> THE COURT: So, if someone was like an air conditioner repairman, and I guess he was in someone's attic and got contact from cocaine from, I don't know, what, someone's air conditioner, okay? Is that even possible, first of all?
>
> [Dr. Wimbish]: Anything is possible.
>
> THE COURT: Okay. Is it probable?
>
> [Dr. Wimbish]: No.
>
> . . . .
>
> THE COURT: Let's just say cocaine was in someone's air conditioning system so much that it produced a positive for cocaine, wouldn't like everybody in the household be -- that is a lot of cocaine.
>
> [Dr. Wimbish]: It would be a big box of it.
>
> THE COURT: Okay. Is that a realistic story?
>
> [Dr. Wimbish]: No.

Dr. Wimbish noted that hair and nail tests measure different time frames but are both reliable when performed by a certified laboratory. Because of the difference in the amount of time needed to harvest hair versus toenails, Dr. Wimbish said that it was theoretically consistent for someone who had used cocaine on May 25 to test positive for cocaine through a hair test on June 22 and negative on a toenail test on July 25.

21

Father's expert Dwain Fuller, a forensic toxicologist, said that the cocaine metabolite benzoylecgonine—which was found in Father's June 22 hair sample—was not a true marker that proved ingestion because it is an automatic chemical breakdown of cocaine and that it would be more important to find norcocaine, ecgonine metyl ester, or hydroxyl metabolites because these are produced when liver and blood enzymes act upon cocaine, proving ingestion. He was not sure whether Father's positive hair-strand test had reported hydroxyl metabolites but said that there had been no norcocaine or cocathylene found in the test results. In Fuller's opinion, the possibility of passive exposure could not be ruled out, and he explained that the chance of testing positive from one's hair was much higher than from one's toenail because hair is more readily exposed to everything in the environment, whereas "[u]nless you walk around barefooted on a carpet that has got cocaine on it, which is possible in some environments," a toenail is less likely to be environmentally exposed to a drug. As Fuller stated, in

> [a]n air conditioning system, as everybody probably is aware, air is pulled constantly out of the house through a filter and then pushed back through the ducts and such, so it collects a lot of the household dust and particulate matter. So someone sticking [his] head in the place where that filter exists or in the ducts, if cocaine had been used in that house in the past or whatever, it would not surprise me that you could get exposed to cocaine. We are talking about a very, very small amount of cocaine here.

Fuller explained that hair is porous, so washing it after environmental exposure to cocaine could actually lead to its absorption into the hair's shaft.[32]

When asked if he believed Father's account, Fuller explained why he found Father's story plausible:

> You know, a few years ago, I would say, no, but I have seen so many of these cases now where people are positive for cocaine in their hair, and there is no other evidence they have used, so I'd say I think it is a plausible story. I don't know -- believe it or not, I don't know him, I have never met him, so I really don't know. I tell you what does cause me concern is the fact that the toenail one month later is negative . . . I really don't know if he used or not, to tell you the truth, but would say that there is nothing in his test that precludes his story.

Fuller conceded that the lack of metabolites did not mean that Father had not used cocaine.

Renee said that she had never known Father to be a drug user, that she had never seen him use any drugs, that she had never used drugs, and that she did not believe that Father had ingested cocaine.

Father's drug tests after June 22, 2018, were negative. However, both Father and Mother failed to comply with the trial court's August 3, 2018 "continuous sweat patch testing" requirement, which was to be ongoing "until further order of the court." After Father testified that it had not been explained to him how frequently he was to get the sweat patch, the trial court challenged his assertion:

---

[32]Fuller referenced a 2014 article from the Journal of Analytical Toxicology entitled, "Analysis of Extensively Washed Hair from Cocaine Users and Drug Chemists to Establish New Reporting Criteria."

THE COURT: . . . The Order does say "continue sweat patch testing until further order of the Court". Was that ambiguous to you?

[Father]: No, ma'am.

THE COURT: Did the Court ever order you to stop doing sweat patch testing?

[Father]: No, ma'am.

Father said that he had submitted to two or three sweat patch tests,[33] that he had taken a sweat patch each time he had taken a drug test, and that all of the tests had been negative.

## 5. Parental Alienation

Dr. Galloway defined parental alienation as when someone close to the child attempts to negatively affect the child's relationship with a parent by bad-mouthing that parent. She said that it could also include planting information in the child's mind about things that have not happened, such as false abuse allegations, and that it could be "as small as eye rolls when the other parent's name is mentioned." Dr. Galloway noted cases of pure alienation rarely occur and that there might more typically be a combination of alienation and bad behavior by the parent who is being alienated. In July 2017, Zachary told Dr. Galloway that Father had told him that

---

[33]Father's drug-test results were admitted into evidence and showed that his sweat patches were collected and tested on August 8, 2018 (negative), and November 8, 2018 (negative).

24

Mother was his "baby mama" and that Renee was Zachary's "mom." Dr. Galloway said that the "baby mama" comment would fit under the definition of alienation.

In November 2018, Zachary told Dr. Galloway that he felt very angry when Father talked to Grandma in a mean voice. In January 2019, Zachary told Dr. Galloway that Father had told him that Grandma was old and would die soon. He also reported that Father would not give him all of his MiraLAX and that Father told him that Grandma "is stupid[;] he needs vegetables to help him poop." He said that Father told him that it was Grandma's fault that Zachary could not accompany him to a deer lease because Father went during Grandma's time of possession.

Father denied having told Zachary that it was Grandma's fault that he could not go to the deer lease with him. He denied having talked about Mother and Grandma in front of Zachary and denied having told Zachary that Mother was a drug addict and a loser or having told Zachary that Grandma—who was 64 years old at the time of the trial—was old, sick, and going to die soon. Renee claimed that Father did not speak negatively about Mother or Grandma and was "very, very careful about what he says" because he did not "want to say anything to get in trouble with this whole thing going on."

Dr. Galloway testified that Zachary had never reported anything of concern regarding Grandma and Mother but that she had concerns about what Zachary had reported to her about whether he received his medicine at Father's house. She had no concerns that Zachary had been coached, pressured, or manipulated by Grandma or

25

Mother but was concerned about how Zachary was disciplined when in Father's care.

Dr. Galloway opined that Zachary knew the difference between the truth and a lie.[34]

Dr. Galloway described the relationship between Zachary and Father as unpredictable, stating,

> It seems that [Zachary] wants a good relationship with [Father]. He's talked to me about wanting to play with [Father], wanting to spend time with [Father] and getting upset if [Father] says that he's tired or busy. So I know that he wants to engage with him, although he regularly discusses feeling intimidated by him. So I think that he has mixed feelings related to his relationship with [Father].

Dr. Galloway had been treating Zachary for anxiety related to his family dynamic, noting that he had had a lot of inconsistency in his life:

> He's lived with Dad, lived with Mom. He's been back with Dad. Now he's with Grandma. And for a child that's been shuffled around like that and due to instances of dysfunction or unhealthiness with either or both parents, it can create a lot of insecurity and anxiety. It just feels like their world is not stable.

### 6. Communication and Participation

With regard to communication about Zachary's school, Grandma testified that she had tried to communicate with Father by text and email but that he would not respond, explaining, "I don't get a response back, so I just send him everything that the school sends me." During his March 15, 2019 testimony, Father claimed that

---

[34]Zachary's first-grade teacher said that Zachary told the truth most of the time, but she noted that there had been occasions when he had not, such as when he tried to make sure that he finished his work as quickly as those around him and claimed to have finished work that he had not finished.

Grandma had not sent him any emails since August 2018. Father's testimony was contradicted, however, by Grandma's December 2018 and January 2019 emails to Father, which were admitted into evidence and which showed that

- On December 26, 2018, Grandma notified Father that she had signed Zachary up for basketball starting on February 24, 2019;

- On January 8, 2019, Grandma forwarded to Father the school's "First Grade News" for that week;

- On January 11, 2019, Grandma notified Father that Zachary had been sick and went to the doctor that day and informed him of the dates and times of Zachary's next two appointments with Dr. Galloway;

- On January 18, 2019, Grandma forwarded Zachary's grades to Father;

- On January 23, 2019, Grandma notified Father of an appointment change with Dr. Galloway and of Zachary's next appointment with Dr. Osuntokun;

- On January 25, 2019, Grandma sent Father the "First Grade News" from Zachary's school for the week of January 28–February 1;

- On January 30, 2019, Grandma sent to Father Zachary's mid-year Developmental Reading Assessment report;

- On February 2, 2019, Grandma informed Father that Zachary had been diagnosed with strep throat; and

- On February 8, 2019, Grandma forwarded to Father the "First Grade News" for February 11–February 15.

As to Zachary's school activities, Father offered various excuses for his lack of participation. Father said that he did not go to Zachary's first day of school in 2018 because he was working, although his failure to attend the evening meet-the-teacher

27

event on August 23 was unexplained.[35]  He claimed that he had not ordered any

school pictures because he "didn't know they offered them."[36]  He claimed he was not

informed about the parent-teacher conference and the school's open house and that

he knew nothing about any awards.[37]  Likewise, Father said that he had not been

notified about other meetings at Zachary's school.  Father admitted that he did not

know who Zachary's teacher was and had never met her.[38]  When questioned by the

trial judge, "Did you ever pick up the phone and talk to the school and say how is my

son doing?"  Father replied, "I didn't, ma'am.  I know it is an excuse.  I just -- I did

not do it."

As to Zachary's extracurricular activities, Father testified that Zachary's

basketball games were on Sundays but that "the last couple of times [Zachary] didn't

want to go."  This excuse was contradicted by Dr. Galloway, whose notes indicated

---

[35]The trial court admitted into evidence Grandma's August 9, 2018 text to Father listing Zachary's upcoming dentist and counseling appointments, the August 23, 2018 meet-the-teacher night, and Zachary's next appointment with Dr. Osuntokun.

[36]The January 28–February 1 "First Grade News" that Grandma sent to Father announced that February 6 was picture day.

[37]In the January 8–11 "First Grade News," Developmental Reading Assessment Testing was listed as occurring January 8–January 25; awards were announced as taking place in the gym on January 11 at 9 a.m.  The February 11–February 15 "First Grade News" announced that awards would be presented on February 22 in class at 9 a.m.

[38]Zachary's first-grade teacher likewise said that she had never met Father, had never spoken with him on the phone, and had never had contact with him by email.

that during his February 25, 2019 counseling session, Zachary had related that even though he had told Father that he wanted to go to his basketball game, Father had sent Grandma a text saying that Zachary did not want to go.

Father admitted that while Zachary was in Grandma's possession from August 2018 to February 2019, he had never called Grandma and asked to speak with Zachary or to discuss with her how Zachary was doing. Father explained this by stating, "'There [was] nothing to say at this point." Father said that the reason he had not taken an active role since Zachary had started living with Grandma was his desire to minimize conflict with Grandma and his expectation that Zachary would not "be there that long."

Father never took Zachary to any appointment with Dr. Galloway although he had communicated with her by phone a couple of times regarding billing and scheduling. Father defended this by pointing out that Zachary's appointments were set for 3:00 in the afternoon, when it was "hard to make it through traffic and get there on time and [when he was] having to deal with customers." While he acknowledged that his son's situation was important, he stated that in some situations, a customer's air conditioning needs would trump Zachary's counseling because "people [were] without air" and he could not reschedule customer business.[39]

---

[39]Father said that his work varied from week to week but that he could visit anywhere from 1 to 35 homes in a week and that he was on call "24 hours a day, seven days a week."

Mother testified that Father did not seem interested in taking an active role in raising Zachary because although he had been invited to everything Zachary had been involved in—baseball, soccer, basketball, and school activities—he had attended none of these activities since December 2018. She said that she had no idea why Father wanted to be Zachary's primary conservator but opined that it was because Father did not want her to have Zachary or to have to pay child support.[40] Father acknowledged that since August 2018, when Grandma had been named Zachary's temporary sole managing conservator, he had neither provided financial support for Zachary nor inquired if Zachary needed anything.

With regard to Father's finances, Father initially had no idea how much he had earned in 2018 before expenses, and the trial court chastised him for having failed to provide a profit-and-loss statement. A week before trial resumed on April 3, 2019, Father and Renee had an income statement prepared using bank statements, invoices, and receipts. Father testified he had the financial wherewithal to support Zachary even though he might not be able to show on paper that his business was profitable. Renee generally paid for their expenses.[41]

---

[40]Father said that he was willing to waive any financial support from Mother.

[41]When asked about Father's testimony that he had not been financially assisting Grandma to take care of Zachary, Renee replied, "First of all, we didn't know that she needed some financial help," and then pointed out that they were "still paying for a lot of things for him, and [that they were] paying for attorneys."

### 7. Plans for the Child

Mother testified that it would be in Zachary's best interest for Grandma, not Father, to be his primary managing conservator.

Father acknowledged that Zachary had lived with Grandma for most of his life but said that a parent should take care of him. When asked at trial if Zachary was happy, Father replied, "As far as I know." He said that he believed Zachary was comfortable in his house.[42] He said that he had missed none of his court-awarded possession since Grandma had obtained custody. Father said "absolutely" when asked whether he wanted to spend as much time as possible with Zachary.

Father acknowledged that he did not get along with Mother and Grandma. Father also accused Grandma of leaving Zachary alone when she worked overnight.[43] And he complained that Grandma was disrespectful of him and would not look at him or acknowledge him.

---

[42]During his February 25, 2019 session, Zachary told Dr. Galloway that Father "got really mad at the tv and smashed it with a hammer, then threw it in the pool." Father and Renee both denied that this had occurred.

[43]Grandma testified that on average, she takes two or three trips a week, and since August 2018, she had mostly been working "turns" so that she was not away at night. She had increased her work hours but said that Martin took care of Zachary when she had to travel overnight, and Father does not complain on appeal about Grandma's receiving managing conservatorship. According to Grandma, it had not occurred to her to ask Father if he would be willing to take care of Zachary when she was away.

Grandma said that she did not have a problem with Father but that "he had a problem with [Mother] when [Mother] had [Zachary]," and she observed that he seemed to have a problem with her. Grandma said, "I've said 'Hi' to him when we've met to – to drop [Zachary] off, and he doesn't speak, so I just decided just not to talk anymore." Renee attributed the animosity between Father and Grandma to the stressful litigation and observed that both sides needed to find common ground for Zachary's sake.

Renee testified that she had a great relationship with Zachary and that she got along with Grandma and Mother. She said she did the majority of pickups and drop-offs because it was easier on Zachary, observing, "I know [Zachary] can see if there is any -- even if there [are] not any words exchanged, [Zachary] knows. If there is any conflict he knows; he is smart, you know, so he knows, so I try to keep the peace as much as I can. I want everybody to be comfortable."

Renee testified that it would be in Zachary's best interest for Father to have custody, stating,

> I know [Father] is a good father. I have seen it. I know he is a good man. I know that we have a stable home. We are both there, you know, we are both there for him and when we had him before, [Father] was very involved. I really honestly think that [Zachary] should be with us.

Renee opined that Father and Zachary had a great relationship that had improved as Zachary had gotten older. She said that Zachary was obsessed with board games and

32

wanted "to beat daddy at anything." Mother liked Renee and said that they got along well. Father agreed that Mother and Renee co-parented well.

Grandma said that Zachary liked to ride his bike, to jump on his trampoline, to watch YouTube, and to make slime. He played age-appropriate, G-rated video games and played baseball in the fall, basketball in the winter, and soccer in the spring. Grandma described a typical day for them when she had an overnight trip scheduled: "I'm home all day. I pick him up at 3:00 o'clock, and then we do his spelling and his reading. I fix his dinner, and then I leave around 7:30, between 7:30 and 8:00. I fly either to L.A. [or Tulsa] and then turn around and come back. I'm back by 5:00 in the morning." Grandma said that she was gone two nights a week but one of those nights was on a weekend when Zachary was with Father. If her flight did not arrive in time for her to make sure Zachary would get to school on time, Martin, who had a valid driver's license and no CPS involvement, would make sure that Zachary got to school on time.

Grandma said that when Zachary was with Father, Father was fine but that she did not think that Zachary was fine with Father. "[Zachary] has – since he's been two and a half, from the very first night he spent the night with [Father], he cries every time he goes over there, every time."

Grandma testified that she believed it was in Zachary's best interest to have limited time with Father—twice a month, on Saturdays and Sundays—because Zachary did not want to go there on Fridays. Grandma explained that she had asked

for sole managing conservatorship because she loved Zachary and had been with him since the day he was born, that he was safe with her, that he had a stable home with her, and that he loved the school that he attended when living with her.

Zachary told Dr. Galloway that he loved living with Grandma but showed her a "thumbs down" when she asked him about his time with Father, and in more than one counseling session, he told her that he did not want to live with Father and expressed that he hated Father because Father used to spank him, was mean to him, and yelled at him. He also resented Father for having removed him from his Northwest ISD kindergarten during the preceding school year. He complained that Father would not take him to his baseball games because Father wanted him to play baseball where Father lived and that Father got mad when Zachary told him that he did not want to live with him.

## C. Closing Arguments and the Trial Court's Judgment

During closing arguments, Father argued that Mother's drug addiction made her a poor choice for managing conservatorship, that Dr. Galloway's records showed a "systematic pattern" of how Mother and Grandma had tried to push Father out of Zachary's life, that Zachary's statements to Dr. Galloway were unreliable, that Father had a great home with a wonderful wife, and that Father had not used cocaine because the true metabolic indicators were not present.

Mother argued that Father was only seeking managing conservatorship so that he could avoid paying child support and that he hated Grandma and had carried on

the litigation to thwart her. Grandma argued that Father "would have had to have been changing air-conditioning filters for a week in a crack house in order for that amount of cocaine to be in his system" and that the focus should be on who could best meet Zachary's needs.

At the conclusion of trial,[44] the trial court appointed Grandma as Zachary's sole managing conservator, named Mother and Father as possessory conservators, and ordered both parents to pay child support to Grandma. In the order, the trial court found that appointment of Grandma as Zachary's sole managing conservator was in the child's best interest and that appointing Mother and Father as Zachary's managing conservators

> would substantially endanger . . . [Zachary's] physical health or emotional development, which finding of endangerment is based in part, but not in whole, on the following issues:
>
> 1. [Mother's] past drug use and continued drug use of illegal drugs despite a finding that [Mother] has made efforts to deal with her addiction but has been unable to do so;
>
> 2. [Father's] use of cocaine;
>
> 3. [Father's] failure to admit to and deal with his use of illegal drugs;
>
> 4. [Father's] refusal to cooperate with [Grandma];
>
> 5. [Father's] lack of engagement with the child . . . for substantial periods, even with full knowledge this case was pending;

---

[44]The trial court conducted the bench trial in a piecemeal fashion, hearing evidence on March 15, 2019; April 3, 2019; and May 1, 2019.

6. [Father's] lack of financial support for the child; and

7. [Father's] and [Mother's] refusal to comply with this Court's drug testing order.

Because Mother and Father were appointed possessory conservators, the trial court set out the terms of their supervised possession of Zachary. *See* Tex. Fam. Code Ann. § 153.006(c) (stating that, as to possessory conservators, the court "shall specify and expressly state in the order the times and conditions for possession of or access to the child, unless a party shows good cause why specific orders would not be in the best interest of the child").[45] The order stated that its terms would be in effect until Zachary turned 18 or was otherwise emancipated. *But see id.* § 156.101(a)(1)–(2) (providing for modification of order establishing conservatorship or possession and access based on the child's best interest and either a material and substantial change in circumstances of the child, a conservator, or other party affected by the order or when the child is at least 12 years old and has expressed his preferences to the court in chambers).

---

[45]Father was given the second and fourth weekends of each month; spring vacation "every other two years (i.e., 2021, 2022, 2024, 2025[,] etc[.])"; two weeks of summer possession; Christmas holidays in odd-numbered years; Thanksgiving in even-numbered years; and Father's Day. Mother was given the first and third weekends; spring vacation "every year not designated for [Father]"; two weeks of summer possession; Christmas holidays in even-numbered years; Thanksgiving in odd-numbered years; and Mother's Day. *See generally* Tex. Fam. Code Ann. § 153.312 (setting out standard possession schedule for parents who reside 100 miles or less apart).

The trial court's order specified that the parties could mutually agree to possession in advance but, in the absence of mutual agreement, they would have possession as set out in the trial court's modified possession order. The order further required that Father's access to Zachary during his periods of possession

> be continuously supervised by [his wife, Renee], which means that [Renee] shall be in the same home or building with the child and be within hearing range of the child at all times during [Father's] periods of possession. For purposes of this order as it relates to supervised possession, "eyes-on" supervision is not required, but hearing range supervision is required.

Similarly, the order required that Mother's access be continuously supervised by Grandma, within hearing range.

> With regard to Zachary's birthday, the trial court's order stated,

> If a parent is not otherwise entitled under this Modified Possession Order to present possession of the child on the child's birthday, that parent shall have possession of the child beginning at 6:00 p.m. and ending at 8:00 p.m. on that day, provided that that parent picks up the child from [Grandma's] residence and returns the child to that same place.

*See id.* § 153.314(4) (stating that the parent not otherwise entitled to present possession on the child's birthday under the standard possession order "shall have possession of the child beginning at 6 p.m. and ending at 8 p.m. on that day, provided that the parent picks up the child from the residence of the conservator entitled to possession and returns the child to that same place"); *see also id.* § 153.253 (stating that the trial court shall render an order that grants periods of possession of the child as similar as possible to those provided by the standard possession order if the work

37

schedule or other special circumstances of the managing conservator, possessory conservator, or the child make the standard order unworkable or inappropriate).

## D. Findings of Fact

Upon Father's request, the trial court filed findings of fact and conclusions of law. In Finding 27, the trial court elaborated on its conclusion that appointing him as managing conservator would substantially impair Zachary's physical health or emotional development "for the following reasons and other reasons presented at trial":

a. the preponderance of the evidence indicates that [Father] used cocaine during the pendency of the case;

b. [Father] failed to admit and deal with his use of illegal drugs in that [Father] contended his positive drug screen for cocaine was a result of [Father's] employment as an air conditioning mechanic;

c. [Father] failed to wear a continuous sweat patch after August 3, 2018, as ordered by the Court;

d. [Father] failed to cooperate with [Grandma] as it related to the child's care, and more specifically;

e. [Father] failed to respond to any of [Grandma's] e-mails or texts as they related to the following:

   (1) The child's medical care and notice of appointments;
   (2) The child's counseling sessions;
   (3) The child's school activities; and
   (4) The child's extracurricular activities;

f. [Father] refused to talk to [Grandma] when the child was exchanged between the parties;

g. [Father] refused to cooperate with [Grandma] in caring for the child when [Grandma] had primary possession of the child.

h. [Father] failed to take an active interest in the child for substantial periods, even with full knowledge this case was pending, and, more specifically:

i. [Father] failed to attend the child's school events such as the child's two Admission, Review and Dismissal (ARD) meetings, his award ceremonies, his 1st day at school, and school lunches;

j. [Father] failed to attend the child's extracurricular activities or take the child to said activities during his periods of possession.

k. [Father] did not know the name of the child's current teacher . . . and had never talked to her.

l. After [Grandma] was appointed temporary sole managing conservator of the child in August 2018, [Father] never called or spoke to the child on the telephone while the child was in [Grandma's] possession.

m. [Father] failed to provide financial support for the child during the pendency of the case, and, more specifically:

n. [Father] failed to provide [Grandma] with any financial support to assist [Grandma] with the child's needs after [Grandma] was appointed temporary non-parent sole managing conservator of the child.

o. [Father] failed to personally participate in the child's counseling sessions with Dr. Gina Galloway, the court appointed counselor for the child, except that [Father] did pay 50% of Dr. Galloway's fees for said sessions.

p. [Father] failed to acknowledge the child's medical diagnosis of Overflow Fecal Incontinence (encopresis) and a rare skin disease called Granuloma Gluteal Infantum initially made by Dr. Stephen Weis and subsequently by Bankole Osuntokun, M.D., a gastroenterologist at Cook Children's [Medical Center,] and his failure to follow the instructions of that doctor.

q. [Father's] taking the child to the pediatrician for a medical opinion without sharing with that doctor the findings of the pediatric gastroenterologist that had been treating the child for a long period of time;

r. [Father] failed to attend any of the child's medical appointments scheduled by [Grandma] after August 3, 2018, or participate in any manner with regard to the child's diagnosis of fecal incontinence;

s. [Mother] does not believe it is in the best interest of the child that [Father] be appointed managing conservator of the child;

The trial court also found that placing Zachary with Father unsupervised would constitute a threat to Zachary's physical health or emotional development. The trial court found that there had been competing experts with regard to the meaning of Father's drug test, found Dr. Wimbish more credible than Fuller, and noted that there was no evidence that the articles cited by Fuller were peer-reviewed or otherwise generally accepted in the scientific community.

The trial court also made findings regarding Dr. Galloway's counseling, noting that Zachary had reported to her that Father had hit him with a belt "for pooping in his pants," that his relationship with Father was not good, that he did not like Father because Father was "mean and harsh with him," that Father sporadically did not give him his medicine, and that he wanted to live with Grandma and Mother.

### III. Discussion

A child's best interest must always be the court's primary consideration in determining the issues of a parent's possession and access. *See id.* § 153.002; *see also*

40

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Indeed, the state's public policy is to assure that a child will have frequent and continuing contact with parents who have shown the ability to act in his best interest and to provide a safe, stable, and nonviolent environment for him. Tex. Fam. Code Ann. § 153.001(a). Accordingly, the court may limit the rights and duties of a parent appointed as a conservator upon a written finding that such a limitation is in the child's best interest. *Id.* § 153.072. But an order that imposes restrictions or limitations on a parent's right to possession of or access to his or her child "may not exceed those that are required to protect the best interests of the child." *Id.* § 153.193.

## A. Standard of Review

We review the trial court's decisions on possession of a child for an abuse of discretion. *K.T. v. M.T.*, No. 02-14-00044-CV, 2015 WL 4910097, at *3 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But no abuse of discretion

41

occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

Legal and factual sufficiency are not independent grounds of error in this context; rather, they are relevant factors in deciding whether the trial court abused its discretion.[46] *K.T.*, 2015 WL 4910097, at *3. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information upon which to exercise its discretion and then whether it erred in its application of that discretion. *Id.* The traditional sufficiency review is involved in answering the first question[47] and whether the trial court made a reasonable decision in answering the second. *Id.*

---

[46]As with jury findings, a trial court's fact findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Id.*

[47]In determining whether legally sufficient evidence supports a finding, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Anything more than a scintilla of evidence is legally sufficient to

42

We must be cognizant that the trial court is in a better position to decide issues in custody cases because it observed the demeanor of the parties and their witnesses and had the opportunity to evaluate each conservator's claims. *Id.* at *5. We thus defer to the trial court's resolution of underlying facts and to its credibility determinations. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Most orders arising from a suit affecting the parent-child relationship will not be disturbed on appeal unless the complaining party can demonstrate a clear abuse of discretion." *In re J.R.P.*, 526 S.W.3d 770, 777 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

## B. Possession

The *Holley* best-interest factors may be considered with regard to possession and access decisions. *In re B.O.*, No. 02-16-00485-CV, 2017 WL 2590571, at *24 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.). These factors used to determine the child's best interest are nonexclusive and may include the child's

support a finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

desires, the child's current and future emotional and physical needs, the child's current and future emotional and physical dangers, the parental abilities of those seeking custody and their plans for the child, and the acts or omissions of a parent that may indicate that the parent-child relationship is not a proper one, along with any excuse for such acts or omissions. *Holley*, 544 S.W.2d at 371–72.[48]

### 1. Supervised Possession

In his first issue, Father argues that the trial court abused its discretion by ordering that he have only supervised possession of Zachary because the evidence is insufficient to support that order when there are less-restrictive ways to protect the child's best interest. Father complains that the trial court's dislike of him "was apparent at numerous points during the trial" and speculates that this dislike "may have led the trial court to cross into punishing [him] instead of protecting the child, in turn resulting in overly restrictive limits on [his] parental rights."

Father asserts that the trial court justified its order requiring supervised possession on "three broad categories of facts" set out in Fact Finding 27(a)–(r), *supra*: Father's positive drug test, Zachary's medical condition, and Father's "alleged lack of involvement in the months between temporary orders and trial." He complains that "these categories do not, individually or collectively, support the trial court's order for supervised visitation" and that less restrictive alternatives were available to protect

---

[48]Father argues that "[t]o the extent they are relevant, the *Holley* factors also do not justify the trial court's order for supervised visitation."

44

Zachary's best interest. Father argues that the behavior the trial court found troubling "could be, and should be, addressed through less-restrictive means such as court-ordered counseling or directives to follow doctors' recommendations."

We disagree that the trial court was required to consider less-restrictive means. A trial court may place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest. *B.O.*, 2017 WL 2590571, at *24. The question, then, is whether ordering within-hearing-range supervised possession exceeds what is necessary to protect Zachary's best interest, based on the evidence presented at trial. As set out above and explained below, the record contains ample evidence of a nexus between the parties' parental abilities and the child's best interest (his desires and current and future emotional and physical needs) sufficient to support the trial court's order. *See Holley*, 544 S.W.2d at 371–72.

Regardless of the sufficiency of that evidence, Father nonetheless challenges the sufficiency of the evidence to support the trial court's findings that he refused to acknowledge Zachary's medical diagnosis, that he took Zachary to a doctor without sharing a prior diagnosis from a different doctor, that he did not attend medical appointments after Grandma was appointed sole managing conservator in August 2018, and that he sporadically failed to give Zachary his medicine.

But as we have set out above, in extensive detail, the record reflects evidence from which the trial court could reasonably conclude that Father did not believe in Zachary's medical diagnoses, notwithstanding the medical and photographic evidence,

45

and that Father had failed to follow the medical protocol of giving Zachary his MiraLAX to help regulate his bowel issues, resulting in Zachary's continued fecal incontinence and painful blisters on his bottom from lack of hygienic care until Grandma was given temporary custody of him in August 2018.[49] From the evidence in the record, the trial court also could have reasonably concluded that Father did not attend any of Zachary's medical appointments or ask to have them rescheduled to a more convenient time for him, even though he had received Grandma's messages about them. As the trier of fact, the trial court was not obligated to believe Father's testimony about his compliance with Zachary's medication.

Father argues that if the trial court had been "legitimately concerned that [he] would not give [Zachary] the medicine as requested by the child's doctor," it could have ordered him to do so instead of imposing supervised possession. But the record reflects that Father had already demonstrated his recalcitrance in following—or his inability to understand—the trial court's orders during the course of the case, for example, with regard to "continuous" sweat patch testing. Rather than punishing Father, the trial court could have concluded that supervision by Renee would be easier and more acceptable to Father than being subjected to possible contempt for violating specific court-ordered requirements that he might not fully appreciate or understand.

---

[49]Father claims that the evidence is conflicting with regard to his treatment of the child's medical condition, but the photographs of Zachary's bottom that were admitted into evidence showed the condition of the child's bottom after he had been in Father's care.

Further, the record supports the trial court's conclusion that it would be in Zachary's best interest for Renee to supervise Father's possession because of evidence of Father's having punished Zachary for medical matters that the child could not control by spanking him—with or without a belt—and that Father had been mean and harsh to him. *But cf. Baltzer v. Medina*, 240 S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that record was devoid of evidence to support finding child's mother had a history or pattern of physical abuse or neglect of the child or any other basis to deviate from the standard possession order guidelines and order that her visitation be supervised).

The record also reflected that Father had called Zachary names, including one directly referring to his medical condition, and that Zachary had told Dr. Galloway that Father had made unkind remarks about Mother and Grandma to him, all things that the court could have believed Father was less likely to do if Renee was within earshot. And while the trial court could have ordered Father to participate in counseling, *see* Tex. Fam. Code Ann. § 153.010(a), we cannot say that the trial court abused its discretion by opting not to in light of the priorities Father demonstrated during the trial, i.e., that the needs of his customers took priority over Zachary's counseling sessions and other activities.

47

Accordingly, we conclude that the trial court did not abuse its discretion by requiring Father's possession of Zachary to be supervised by Renee,[50] and we overrule Father's first issue.

### 2. Specific Steps

In his second issue, Father argues that the trial court abused its discretion by failing to order a possession plan by which he could eventually have unsupervised possession, arguing that this would have been a better option than requiring him to file a new lawsuit to avoid supervised possession in the future. *See id.* § 156.101(a). We again disagree.

In contrast to this private action, when a child is removed from his parents by the Department of Family and Protective Services (DFPS), the court is required to review DFPS's visitation plans and render an appropriate order. *See id.* § 263.109(a). Upon such review, if the court finds that visitation is not in the child's best interest, the court "shall render an order that: (1) states the reasons for finding that visitation is not in the child's best interest; and (2) outlines specific steps the parent must take to be allowed to have visitation with the child." *Id.* § 263.109(b). And in such a case, if

---

[50]Because we conclude the medical-related evidence is sufficient to support the trial court's decision, we do not reach Father's argument that there is no evidence or insufficient evidence to support the trial court's drug-related findings. *See* Tex. R. App. P. 47.1. We likewise do not reach Father's challenges to the trial court's finding that he was inattentive of Zachary during the months that Grandma had sole managing conservatorship, although—as set out above—there is ample evidence in the record to support this latter finding. *See id.*

the visitation order requires supervision to protect the child's health and safety, the order must also "outline specific steps the parent must take to have the level of supervision reduced." *Id.* § 263.109(c).

But in non-DFPS cases like this one, ordered restrictions on a parent's right of possession simply "may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193. Section 153.193 contains no similar provision requiring the trial court to provide an outline of specific steps to take to reduce restrictions. *Cf. id.* § 153.004(d-1)(1)–(2) (allowing trial court to design a possession order to protect the child's safety and well-being when a parent has a history of domestic violence or sexual abuse), § 263.109(c). Rather, for orders deviating from a standard possession order, the trial court "shall be guided by" the standard-possession-order guidelines but may consider the child's age, development status, circumstances, needs, and best interest; the conservators' circumstances; and "any other relevant factor." *Id.* § 153.256. While Section 153.193 does not envision a complete denial of access— which is not the case here—even a severe restriction or limitation is permissible if it is in the child's best interest because the child's best interest "is the primary consideration in determining issues of possession and access." *Chad Lee S. v. Melinda A.S.*, No. 02-14-00135-CV, 2015 WL 7820584, at *11 n.7 (Tex. App.—Fort Worth Dec. 3, 2015, no pet.) (mem. op.).

Father refers us to *Newell v. Newell* to support his argument against restrictions and in favor of specific steps. 349 S.W.3d 717, 719–23 & n.3 (Tex. App.—Fort

Worth 2011, no pet.). In that case, the father was ordered in the divorce decree to pass random drug-and-alcohol testing up to three times a year for five years to be entitled to unrestricted possession of his child. *Id.* at 718, 720. He did not contest the drug-testing requirement but argued that the evidence was insufficient to support the alcohol-testing requirement and that the restriction exceeded that required to protect the child's best interest. *Id.* at 720. We eliminated the alcohol-testing requirement because it "effectively required [the father] to abstain from any alcohol consumption" for 80 to 92 hours preceding possession of his child when there was only "limited evidence" in the record about his alcohol use. *Id.* at 721. For example, there was no evidence in the record that he had ever been drunk around his child, that he was drinking to the point of intoxication at the time of the trial, that his current or past alcohol use had ever been detrimental to his ex-wife or the child, that he ever drove after drinking, that his personality changed when he drank, or that consuming alcohol within 92 hours prior to having possession of his child would in any way negatively affect her best interest. *Id.* at 722.

One of this court's justices concurred based on how the restriction was worded because he thought there was sufficient evidence to support the restriction if the timing were made clearer. *Id.* at 723–24 (McCoy, J., concurring). The final panel member dissented, concluding that the trial court's ordering the father to take three random alcohol tests per year within 12 hours of possessing his child was neither arbitrary nor unreasonable. *Id.* at 724 (Livingston, C.J., dissenting).

*Newell* involved unique facts and certainly does not stand for the proposition that the trial court *must* include specific steps in a non-DFPS case involving restrictions on possession. *Cf. id.* at 721. The trial court *could* have opted to include specific steps, but we will not second guess its decision when there has been no clear abuse of discretion.[51] *See In re F.A.*, No. 02-16-00156-CV, 2017 WL 632913, at *7 (Tex. App.—Fort Worth Feb. 16, 2017, no pet.) (mem. op.) (holding, when parent complained that the trial court abused its discretion by terminating his possession and access without specifying how he might regain it in the future, that Chapter 156 of the Family Code "provides Father a sufficient roadmap for seeking modification of the order in the future").

Further, there was extensive evidence for the trial court to consider with regard to Father's possession of Zachary, particularly Father's demonstrated lack of interest in his son's academic and sports activities and care of his hygiene.[52] Implicit in the

---

[51]Father insists that the trial court "should have instead ordered [him] to have a certain number of negative [drug] tests or a certain period of months or years of negative [drug] tests so that the restrictions on [his] rights as a parent can be removed without more litigation" and that "[a]ny number of orders could address the child's medical condition or school activities without imposing supervised possession." But we have already addressed Father's demonstrated inability to understand or follow the trial court's orders.

[52]The trial court did not make an express finding that Father had abused or neglected Zachary, and there was no evidence that CPS had found the kind of abuse or neglect sufficient to warrant the State's involvement beyond mere investigation. *Cf.* Tex. Fam. Code Ann. § 153.004(e) (stating that it is a rebuttable presumption that it is not in the child's best interest for a parent to have unsupervised visitation if credible evidence is presented of a history or pattern of past or present child neglect or abuse

trial court's findings was that if Father rectified the detailed list of "failures," less restrictive measures might be available through modification in the future.[53] We overrule Father's second issue.

### 3. Birthday Possession

In his third issue, Father complains that the trial court abused its discretion by giving him and Mother overlapping rights of possession on Zachary's birthday.

Unless there is a subsequent modification, because the trial court assigned to Father the second and fourth weekends of each month, in 2024 and 2025—when Father has possession of Zachary—Mother will get to spend from 6 p.m. to 8 p.m. with Zachary on Zachary's birthday, while Father has him for the rest of his birthday weekend. But as Father correctly points out, for all other years until 2029, when Zachary turns 18, Zachary's birthday will fall on a weekday, when he is in Grandma's

---

by that parent). "Abuse" and "neglect" under Section 153.004 are defined by Section 261.001. *Id.* § 153.004(g)(1). Section 261.001's definitions of "abuse" and "neglect" are considerably broader and more serious than merely being "mean" to a child or failing to take care of his blistered bottom. *See id.* § 261.001(1)(A)–(M), (4)(A). Rather, these definitions require observable and material impairments in the child's growth, development, or psychological functioning; physical injuries that result in substantial harm; criminal activities, including child trafficking; child abandonment; or failing to provide the child with the basic necessities of life. *See id.*

[53]Although Father complains that seeking modification will require him to file a fourth lawsuit in the future and that, if Renee ever divorces him, he will have to file a new lawsuit to obtain a different supervisor, these concerns are either minimal or speculative at best when compared to the child's best interest. We also note that divorce is a material change that would support modification. *See A.L.E.*, 279 S.W.3d at 429.

possession and when neither parent is otherwise entitled to possession. Thus, unless he, Mother, and Grandma can mutually agree to alternative arrangements, Mother and Father will have overlapping rights of possession for two hours on Zachary's birthday during all years except 2024 and 2025.

But there is no legal requirement for the trial court to conform its order to Father's desires to have *exclusive*, nonoverlapping possession of Zachary on his birthday.[54] *See* Tex. Fam. Code Ann. § 153.314(4) (setting out standard possession order language regarding possession on a child's birthday). And there is no abuse of discretion when Father could seek enforcement if Mother or Grandma tried to prevent him from seeing Zachary during the hours of 6 p.m. and 8 p.m. on Zachary's birthday. Rather, as pointed out by Grandma, "Asking parents to cooperate with each other for 2 hours once a year is not too much for the trial court to ask, and is certainly in the best interest of the child." We agree with Grandma. If nothing else, the birthday-possession provision gives the parties a meaningful opportunity to learn how to cooperate and for Father to demonstrate to the trial court that he can cooperate with Mother and Grandma for Zachary's best interest. Accordingly, we overrule Father's third issue.

---

[54]In his reply brief, Father compares the language in the order's birthday paragraph with his right to possession in the Father's Day paragraph and Mother's right to possession in the Mother's Day paragraph to argue that the birthday paragraph grants a conflicting *exclusive* right of possession, ignoring that the respective parent-day carve-outs are exceptions to the normal possession schedule as specifically designated by the trial court.

## C. Fact Findings in the Judgment

In his final issue, Father asserts that the trial court erred by including fact findings within the final order,[55] informing anyone who has possession of, access to, or decision-making rights for the child—which might include Zachary's daycare and healthcare providers—of the trial court's findings that Father had used cocaine, had refused to acknowledge and address his illegal drug use, did not cooperate with Grandma, and failed to engage with Zachary. Father refers us to Texas Rule of Civil Procedure 299a, which states that findings of fact "shall not be recited in a judgment" and shall instead "be filed with the clerk of court as a document or documents separate and apart from the judgment." Tex. R. Civ. P. 299a; *see Howe v. Howe*, 551 S.W.3d 236, 246 (Tex. App.—El Paso 2018, no pet.) ("Rule 299a expressly forbids findings of fact in a judgment.").

To the extent that Father preserved this complaint for our review, *see In re S.V.*, No. 05-17-01294-CV, 2019 WL 1529379, at *4 (Tex. App.—Dallas Apr. 9, 2019, no pet.) (mem. op.); *Howe*, 551 S.W.3d at 247,[56] we have previously noted that when, as

---

[55]Father challenges the seven findings on endangerment that the trial court included on pages 3 and 4 of the final order.

[56]The trial court signed the final SAPCR order on August 29, 2019, but it issued a "Judge's Rendition" on May 13, 2019, setting out the same findings that are complained of on appeal, and Father's trial counsel filed a request for findings of fact and conclusions of law two weeks later. After the SAPCR order was signed, the findings request became timely. *See* Tex. R. Civ. P. 296, 306c. Father's appellate counsel filed a timely notice of past due findings of fact and conclusions of law on September 24, 2019, *see* Tex. R. Civ. P. 297, but no motion to modify or correct the

here, the abuse-of-discretion standard of review applies to the trial court's ruling, findings of fact and conclusions of law that comply with the civil procedure rules are not required. *Green v. Garrett*, No. 02-03-00045-CV, 2004 WL 912671, at *2 (Tex. App.—Fort Worth Apr. 29, 2004, no pet.) (mem. op.). In *Green*, a parent—who had been held in contempt for failing to pay child support and who was then released on community supervision—complained on appeal that the trial court had "improperly included findings of fact and conclusions of law" in the release order instead of in a separate document pursuant to Rule 299a. *Id.* at *1–2. We held that his reliance on Rule 299a was misplaced and that the trial court had not abused its discretion by including those findings when the applicable statute required certain findings in child support enforcement orders. *Id.* at *2 (citing Tex. Fam. Code Ann. § 157.166); *see also Martinez Jardon v. Pfister*, 593 S.W.3d 810, 824–25 (Tex. App.—El Paso 2019, no pet.) (stating, in divorce-and-SAPCR suit, that "[t]he mere inclusion of findings in the Final Decree is not error").

Of course, as pointed out by Father, the order at issue here, a final SAPCR order, is different from the one in *Green* and has different statutory requirements with regard to findings. The required contents of a final SAPCR order (except in a termination-of-parental-rights case) are set out in Family Code Section 105.006, which

judgment to exclude the fact findings contained within the order. *Cf. Howe*, 551 S.W.3d at 247 ("Even though Rule 299a does not permit findings to be contained in the judgment, because no one raised that complaint below, we accept any findings in the judgment as the findings of fact for the purposes of this appeal.").

"provides a framework for what [such] final orders must say." *In re R.R.K.*, 590 S.W.3d 535, 540 (Tex. 2019). A final SAPCR order must contain (with certain exceptions to avoid harassment or abuse) each party's social security and driver's license numbers, current residence and mailing addresses, home and work phone numbers, and the name and work address of each party's employer, as well as a boldfaced, capitalized, or underlined notification that the contact information must be updated within 60 days of an intended change. *See* Tex. Fam. Code Ann. § 105.006(a), (c), (e). If the order includes child support or possession-or-access provisions, it must also prominently feature statutory warnings stating the legal consequences of failing to comply with the order's terms, i.e., enforcement litigation, including contempt proceedings. *Id.* § 105.006(d). Possession provisions require the inclusion of a statutory notice to peace officers of their right to use reasonable efforts to enforce child custody terms. *Id.* § 105.006(e-1). Child support provisions require a notice of how the court may modify the order. *Id.* § 105.006(e-2). Finally, if a party alleged child abuse or neglect, the court may include in the final order a finding on whether the party who made the allegation knew it was false. *Id.* § 105.006(h). Section 105.006 does not require the inclusion of any other findings.

And while the court must "state in writing the specific reasons for the variance from the standard order" when possession is contested and varies from the standard possession order, since September 1, 2017, there is no longer a requirement that those

56

findings be included in the *order itself.*[57]  *See id.* § 153.258(a).  The trial court's order

here was rendered after September 1, 2017, so the 2017 change to the law applies.

Act of May 19, 2017, 85th Leg., R.S., ch. 421, §§ 14–15, 2017 Tex. Sess. Law Serv.

1131.  Under the current statute, the request for findings "must conform to the Texas

Rules of Civil Procedure."[58]  Tex. Fam. Code Ann. § 153.258(b); *see In re A.A.M.*, No.

14-05-00740-CV, 2007 WL 1558701, at *3 n.3 (Tex. App.—Houston [14th Dist.] May

31, 2007, no pet.) (mem. op.) ("In the absence of a requirement that specific findings

of fact be included in the trial court's order, findings included in a judgment cannot

---

[57]Prior to September 1, 2017, Section 153.258 stated,

> Without regard to Rules 296 through 299, Texas Rules of Civil Procedure, in all cases in which possession of a child by a parent is contested and the possession of the child varies from the standard possession order, on written request made or filed with the court not later than 10 days after the date of the hearing or on oral request made in open court during the hearing, the court shall state *in the order* the specific reasons for the variance from the standard order.

Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 152 (emphasis added), *amended by* Act of May 19, 2017, 85th Leg., R.S., ch. 421, § 9, 2017 Tex. Sess. Law Serv. 1130 (current version at Tex. Fam. Code Ann. § 153.258).

[58]Some Family Code provisions expressly require orders to contain findings, such as protective orders, *see* Tex. Fam. Code Ann. § 261.504; visitation and other orders in cases brought by DFPS, *see id.* §§ 263.109(b), .202(a)–(b), (e); orders issued when a court finds that a suit for modification has been filed frivolously or has been designed to harass a party, *see id.* § 156.005; certain child support orders, *see id.* §§ 154.302(a), .183(b); and—as referenced above in our discussion of *Green*— enforcement orders, *see id.* § 157.166(b).  Other Family Code provisions may require specific, statutorily-identified findings upon a party's request, such as net resource findings in a child support order.  *See id.* § 154.130.

form the basis of a claim on appeal."); *In re B.P.H.*, 83 S.W.3d 400, 410 (Tex. App.—Fort Worth 2002, no pet.) (stating that the trial court did not err by signing and entering findings of fact that did not comport with the judgment because the judgment should not have included findings and the separately filed findings controlled for purposes of appeal); *Frommer v. Frommer*, 981 S.W.2d 811, 814 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (holding that findings recited in the judgment "cannot form the basis of a claim on appeal").

The findings at issue were made in support of the trial court's overarching finding that modifying the prior order would be in Zachary's best interest and that appointing either parent as his managing conservator would "substantially endanger" his "physical health or emotional development." This language parallels that which is required in an affidavit to support a motion to modify the designation of the person having the exclusive right to determine a child's primary residence within one year of an earlier order. *See* Tex. Fam. Code Ann. § 156.102(a), (b)(1).[59] And the court "may limit the rights and duties of a parent appointed as a conservator if the court makes a written finding that the limitation is in the best interest of the child." *Id.* § 153.072; *see also id.* § 153.191 (stating that the court shall appoint a parent as a possessory conservator "unless it finds that the appointment is not in the best interest of the

---

[59]The previous SAPCR was based on the parties' December 13, 2017 MSA. Just over two months later, Father filed his petition to modify.

child and that parental possession or access would endanger the physical or emotional welfare of the child").

Accordingly, based on the above, a trial court can make a generic, statutory finding in the final SAPCR order with regard to conservatorship and best interest without abusing its discretion or violating Rule 299a. *See, e.g.*, *Briones v. Carreon*, No. 04-02-00933-CV, 2003 WL 21338475, at *1 (Tex. App.—San Antonio June 11, 2003, pet. denied) (mem. op.) (holding no abuse of discretion when divorce decree's language was "standard form language that is either required by the Texas Family Code or otherwise normally used in divorce decrees").

But the question before us, to the extent that it has been preserved and can be raised, is whether the trial court abused its discretion by making unrequired specific factual findings in the SAPCR order to support its best interest and conservatorship determinations. *Cf. In re J.C.R.*, No. 13-18-00491-CV, 2020 WL 3396603, at *5 n.4 (Tex. App.—Corpus Christi–Edinburg June 18, 2020, no pet.) (mem. op.) (noting that "the trial court's order contained a written finding [under Section 153.072] that the modifications were in the 'best interest' of the children").

In light of the record before us, we think that the trial court abused its discretion by including unrequired specific factual findings in the SAPCR order, but not for the reasons argued by Father.[60] That is, the law and public policy here do not

---

[60]Father argues in his reply brief that, with the findings included in it, the order

59

act to protect Father's best interest or how he is viewed by others with access to Zachary. Rather, the additional, unrequired, specific, and factual information has the potential to violate *Zachary*'s privacy, contrary to *Zachary*'s best interest, which is the overarching concern in the trial court and on appeal.

Accordingly, we sustain Father's final issue and correct the trial court's judgment to delete all seven numbered findings on pages 3–4 of the final order.[61] This portion of the judgment should now read substantially as follows: "The Court further finds that appointment of the parents would substantially endanger the child[']s physical health or emotional development. THEREFORE, IT IS ORDERED that the Intervenor[']s requested relief in her Intervention for Modification is GRANTED." *See In re K.N.C.*, 276 S.W.3d 624, 628 (Tex. App.—Dallas 2008, no pet.) (modifying decree by deleting and replacing terms).

---

will inform the child's school, daycare, healthcare providers, and others that the trial court found that [Father] allegedly used cocaine, refused to acknowledge and deal with his use of illegal drugs, does not cooperate with [Grandma], refuses to acknowledge the child's medical condition, and failed to engage with the child. Only the parties need to know or should ever know the reasons the trial court ruled the way it did.

[61]We note that the findings will remain in the record because they are duplicated in the trial court's separately filed findings of fact.

## IV.  Conclusion

Having sustained Father's final issue, we affirm the trial court's judgment as modified.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered:  April 1, 2021